UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| B.D., a minor, by and through his parents and next friends, Anne and Brantley Davis, *et al.*, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Case No. 15-1139 (RJL)<br>) |
| DISTRICT OF COLUMBIA, | )<br>) |
| Defendant. | ) |

**MEMORANDUM OPINION**

January 21, 2025 [Dkt. #71, #73]

Plaintiffs Anne and Brantley Davis—as parents and next friends of their son, B.D. (together, "plaintiffs" or "the Davises")—brought this action against the District of Columbia ("defendant" or "the District"), claiming that the District of Columbia Public Schools ("DCPS") deprived their son of his rights under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Presently before the Court are the parties' cross-motions for summary judgment [Dkt. #71, #73] on Counts 6 and 7 of the Amended Supplemental Complaint [Dkt. #70]. Upon consideration the parties' briefing, the record in its entirety, and the applicable case law and legal standards, the Court GRANTS IN PART and DENIES IN PART both motions.

## BACKGROUND

**A.   Statutory Background**

The Individuals with Disabilities Education Act ("IDEA") guarantees children with

disabilities a free appropriate public education ("FAPE") with services designed to meet each child's unique needs. 20 U.S.C. § 1400(d)(1)(A); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009). The "primary vehicle" for achieving the statute's goals is the individualized educational program ("IEP"), which is a comprehensive and individualized document that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A)(i).

If parents believe that their child's IDEA rights have been violated, they may file an administrative due process complaint and are entitled to a due process hearing before an impartial hearing officer. 20 U.S.C. § 1415(f). Any party aggrieved by the outcome of the administrative hearing may file a civil action in district court. *Id.* § 1415(i)(2)(A). If a local school district "significantly impede[s] the parents' opportunity to participate in the [IEP] decisionmaking process," a hearing officer or district court may determine that the district denied the child a FAPE. *Id.* § 1415(f)(3)(E)(ii). When a local school district deprives a child of a FAPE, the court has broad discretion to order compensatory education sufficient to put the child in the same position the child would have been absent the FAPE denial. *See Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005); *B.D. v. District of Columbia*, 817 F.3d 792, 797–98 (D.C. Cir. 2016).

B.   **Factual Background and Procedural History**

The parties' long-running dispute over the District's provision of special education services to B.D. has been extensively documented in various opinions of this Court and our

2

Circuit Court.[1] As such, I will limit my recitation of the facts to only those necessary to provide background on the current dispute.[2]

B.D. is classified as a student with multiple disabilities. AR1 at 28.[3] He suffers from various maladies, which have resulted in "significant weaknesses in attentional control, executive functioning skills, emotional control, working memory, cognitive flexibility, and self-regulation/inhibitory control." *Id.* at 29–31. B.D.'s "maladaptive coping mechanisms often result in unsafe and disruptive behavior." *Id.* at 32.

In 2011, B.D. completed a 30-day trial period at the Katherine Thomas School, a private special-education school. *B.D.*, 817 F.3d at 795. The school determined that it was unable to meet B.D.'s needs. *Id.* The Davises then provided in-home tutoring to B.D. for the remainder of the school year. *Id.*; *B.D.*, 548 F. Supp. 3d at 228.

In 2012, B.D.'s IEP was updated to recommend placement in a residential school. *B.D.*, 548 F. Supp. 3d at 229. The Devereaux Foundation accepted B.D., and DCPS recommended that he be placed there, but the Davises rejected the placement. *Id.* DCPS then identified the Eagleton School, which accepted him. *B.D.*, 2021 WL 6049879, at *2. The Davises rejected that placement too. *Id.* After multiple attempts, DCPS was ultimately

---

1 *See B.D. v. District of Columbia*, 75 F. Supp. 3d 225 (D.D.C. 2014); *B.D. v. District of Columbia*, 817 F.3d 792 (D.C. Cir. 2016); *B.D. v. District of Columbia*, 66 F. Supp. 3d 75 (D.D.C. 2014); *B.D. v. District of Columbia*, 548 F. Supp. 3d 222 (D.D.C. 2020); *B.D. v. District of Columbia*, No. 15-cv-1139, 2020 WL 5763608 (D.D.C. Sept. 28, 2020); *B.D. v. District of Columbia*, No. 15-cv-1139, 2021 WL 6049879 (D.D.C. Dec. 21, 2021); *Davis v. District of Columbia*, No. 21-cv-2884, 2021 WL 11680748 (D.D.C. Dec. 21, 2021); *B.D. v. District of Columbia*, No. 13-cv-1223, 2023 WL 6037202 (D.D.C. Sept. 15, 2023); *Davis v. District of Columbia*, 80 F.4th 321 (D.C. Cir. 2023).
2 The Court takes judicial notice of facts in the other related cases because they are "not subject to reasonable dispute" and can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).
3 The notation "AR1" refers to citations to the administrative record prior to remand [Dkt. #36–#41], and the notation "AR2" refers to citations to the administrative record generated following remand [Dkt. #66].

unsuccessful in finding an appropriate placement for B.D., and litigation ensued. *Id.*

During this time, the parties attempted to convene to discuss B.D.'s 2013 IEP and to find an appropriate placement for him. *Id.* DPS held the IEP meeting on July 16, 2013, without the Davies present. *Id.* at *3. The notes to B.D.'s IEP repeatedly state that updates to his goals were impossible to make because the IEP team lacked current information about his behaviors and progress. *Id.* Three days later, DCPS issued a notice of location assignment placing B.D. at Eagleton. *Id.*

Shortly after this meeting, B.D. was hospitalized in two different hospitals. *Id.* The parties reconvened on October 1, 2013. *Id.* They updated B.D.'s "social emotional goals" but did not update B.D.'s goals in any other category. *Id.* DCPS again reiterated its intention to place B.D. at Eagleton, but the Davises rejected the placement. *Id.* at *4.

The Davises sought, and obtained, a stay-put injunction that kept B.D. in his "current educational placement," which consisted of one-on-one tutoring for two hours per day, five days per week, at Lindamood-Bell Learning Processes. AR2 at 522–25. Due to B.D.'s disruptive behaviors, Lindamood-Bell refused to provide services for B.D. after March 24, 2014, unless there was a third party present to help control B.D.'s behavior. AR1 at 898. DCPS refused to pay for behavioral specialist services, so B.D. did not receive any tutoring for the following four months. AR2 at 205. The parties did not reconvene again until B.D.'s next IEP meeting, which was held on July 29, 2014. *Id.*

In January 2015, plaintiffs filed an administrative due process complaint challenging several of DCPS's actions related to B.D.'s special education during the 2013–14 school year. *B.D.*, 2021 WL 6049879, at *4. The hearing officer largely sided with

4

DCPS. *Id.* The Davises appealed the hearing officer's decision to this Court. *Id.* at *5.

On December 21, 2021, I granted in part and denied in part both motions cross-moved for summary judgment. *Id.* at *12. Relevant to the present motions, I held that DCPS denied B.D. a FAPE by holding the 2013 IEP meeting without the Davises, but that DCPS did not limit the Davises' right to participate in B.D.'s 2014 IEP meeting. *Id.* I then remanded the case to the hearing officer to determine the appropriate amount of compensatory education to be awarded B.D. for the 2013-14 FAPE denial. *Id.*

On remand, Hearing Officer Peter Vaden determined that the issue for decision on remand was:

> What would be the appropriate amount of compensatory education to be awarded for DCPS' denial of FAPE to [B.D.] from July 16, 2013 to July 29, 2014 by DCPS' holding the July 16, 2013 IEP team meeting without the presence of the parents, taking into account, as appropriate, Hearing Officer Vaden's May 11, 2021 decision on remand in *B.D. v. District of Columbia*, 13-cv-1223[4] (OSSE Case No. 2013-0211).

AR2 at 88.

The parties then submitted simultaneous cross-motions for summary adjudication. *See* AR2 at 99–659. Plaintiffs argued that B.D. should be awarded $457,729.68, which is the equivalent of one years' worth of services, including a residential placement, that B.D. should have received under a proper 2013 IEP. *See* AR2 at 116. DCPS, on the other hand,

---

[4] In this related case, the Davises invoked the IDEA's stay-put provision, which provides that while parties attempt to administratively resolve disputes over the child's educational placement, "the child shall remain in the then-current educational placement." 20 U.S.C. § 1415(j). The Davises invoked the stay-put provision in April 2013 while challenging B.D.'s July and October 2012 IEPs. *B.D.*, 2023 WL 6037202, at *1. This Court determined that B.D.'s then-current educational placement included one-on-one home instruction for two hours per day, five days per week; on remand, this was expanded to include occupational therapy for five hours per week. *Id.* at *2–4.

argued that B.D. was not entitled to any compensation. *See id.* at 275–79.

Hearing Officer Vaden issued an interim decision on April 18, 2022, in which he reiterated that the task at hand in this proceeding is to "decide where [B.D.] would be if DCPS had not held the July 16, 2013 IEP meeting in the Parents' absence and what is needed to put [B.D.] back in that position." AR2 at 671. Hearing Officer Vaden stressed that the implementation of B.D.'s 2013 IEP is not at issue—rather, he had to determine what IEP DCPS should have provided in 2013. *Id.* at 671, 672 n.3. He concluded that he could determine how the 2013 IEP would have been different had the Davises participated in the meeting by looking to the 2014 IEP. *Id.* at 671. This is because the Davises did participate in the 2014 IEP meeting, and the 2014 IEP differed from the 2013 IEP in two respects: *First*, it included updated goals and present level of performance, and *second*, it included Assistive Technology services for learning and studying. *Id.* at 671. This, he concluded, is the 2013 IEP that DCPS should have provided. *Id.* at 671–72.

Hearing Officer Vaden issued his final decision on January 20, 2023. *Id.* at 4. He concluded that B.D.'s July 2013 IEP would have likely included assistive technology services for that school year if the IEP team had appropriately updated his levels of performance for written expression, with input from his parents. *Id.* at 14. He noted that these services were included in B.D.'s 2014 IEP because B.D. struggled with handwriting and a computer helped his output. *Id.* Hearing Officer Vaden ordered DCPS to provide funding for one hour per week of tutoring services to assist B.D. in using a computer/word processor for writing for 54 weeks as compensatory education. *Id.*

On April 17, 2023, the Court granted plaintiffs' motion to reopen the case and for

6

leave to file a supplemental complaint. April 17, 2023 Minute Order. Plaintiffs filed an amended supplemental complaint on November 10, 2023. *See* Am. Supp. Compl. [Dkt. #70]. The Amended Supplemental Complaint includes two counts: one challenging Hearing Officer Vaden's order of compensatory education, and a second moving for attorney's fees as a prevailing party. *See id.*

The parties have yet again cross-moved for summary judgment. *See* Pl.'s Mot. for Summary Judgment ("Pl. MSJ") [Dkt. #71]; Def.'s Cross-Mot. for Summary Judgment and Opp. ("Def. MSJ") [Dkt. #73, 74]; Pl.'s Opp. to Def.'s Mot. for Summary Judgment and Reply ("Pl. Opp.") [Dkt. #76, 77]; Def.'s Reply to Opp. to Mot. for Summary Judgment ("Def. Opp.") [Dkt. #78].

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In reviewing a hearing officer's decision under the IDEA, the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its determination on the preponderance of the evidence, shall grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Although the review of a hearing officer's decision under the IDEA is styled as a motion for summary judgment, it really "operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 128–29

(D.D.C. 2018).

Plaintiff, as the party challenging the hearing officer's determination, bears the burden of persuading the Court, by a preponderance of the evidence, that the hearing officer erred. *Reid*, 401 F.3d at 521. Courts may not substitute "their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). But less deference is owed in reviewing a hearing officer's decision under the IDEA than in other administrative contexts. *See Reid*, 401 F.3d at 521 ("[J]udicial review under IDEA is more rigorous than in typical agency cases . . . ."); *Kerkam v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) (a hearing officer's decision "without reasoned and specific findings deserves little deference" (internal quotations omitted)). A court overturning a hearing officer's decision must explain its basis for doing so. *Eley v. District of Columbia*, No. 11-cv-309, 2012 WL 3656471, at *4 (D.D.C. Aug. 24, 2012).

## ANALYSIS

### I.   Count Six[5]

In Count Six of the Amended Supplemental Complaint, plaintiffs challenge Hearing Officer Vaden's decision on remand ordering one-on-one tutoring services on a computer/word processor for 54 weeks. *See* Am. Supp. Compl. ¶¶ 82–123. They argue that he "narrow[ed] the issue to be decided on remand," ordered the parties to answer a

---

[5] Plaintiffs ask that the Court accept additional evidence several exhibits. *See* Pl. Opp. at 6–9. Defendant objects to the consideration of these documents. Def. MSJ at 10 n.3; Def. Opp. at 1–4. Because this consideration of this evidence is unnecessary to decide this case, I decline to decide the question of whether these exhibits should be admitted into evidence.

question that "cannot be answered," "misconstrued the evidence presented to him," and reached a decision that is "arbitrary," "d[oes] not comply with applicable law," and is not "grounded in the evidence presented." *Id.* ¶¶ 118–21. They argue that Hearing Officer Vaden should have adopted their proposal for compensatory education. *Id.* ¶ 120.

When a school district fails to provide a student with a FAPE, a district court has "broad discretion to fashion an appropriate remedy," including compensatory education. *B.D.*, 817 F.3d at 798 (quoting *Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015)). An award for compensatory education "must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid*, 401 F.3d at 524. Compensatory education under the IDEA is an equitable remedy, and thus the court must use flexibility and discretion to craft appropriate relief. *Id.* at 523–24 (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993) and *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374 (1985)). Equitable relief "must be drawn with sufficient specificity to remedy the harm shown." *Winpisinger v. Watson*, 628 F.2d 133, 141 (D.C. Cir. 1980). It is a fact-specific inquiry that will "rely on individualized assessments" and "will produce different results in different cases depending on the child's needs." *B.D.*, 817 F.3d at 798 (quoting *Reid*, 401 F.3d at 524). Thus, some awards of compensatory education may be "only short, intensive compensatory programs targeted at specific problems or deficiencies." *Id.* (quoting *Reid*, 401 F.3d at 524).

That indeed is the case here! Plaintiffs have not carried their burden to show that

the hearing officer erred or that their proposed compensatory education plan should be adopted. To the contrary, Hearing Officer Vaden's award of assistive technology services for one year is tailored to remedy the specific FAPE denial the Court previously found. I therefore AFFIRM Hearing Officer Vaden's award of compensatory education.

*First*, Hearing Officer Vaden correctly identified the harm to be remedied. DCPS denied B.D. a FAPE because the "complete exclusion" of the Davises from B.D.'s July 2013 IEP meeting "'significantly impeded' their ability to participate in B.D.'s educational planning." *B.D.*, 2021 WL 6049879, at *8. Thus, he focused on the harm that resulted from the lack of input from the Davises on B.D.'s July 2013 IEP. *See* AR2 at 671–72.

Plaintiffs seek to remedy the harm from B.D.'s lack of residential placement, but that harm cannot be traced back to DCPS's exclusion of the Davises from the July 2013 IEP meeting. DCPS recommended residential placement for B.D., as far back as 2012, based on an IEP that both an independent hearing officer and the Court found complied with the IDEA. *See B.D.*, 2021 WL 6049879, at *10 & n.7; *B.D.*, 548 F. Supp. 3d at 234. While the IDEA guarantees the right of parents to participate in their child's educational planning, it does not "explicitly require parental participation in site selection." *B.D.*, 2021 WL 6049879, at *9 (quoting *James v. District of Columbia*, 949 F. Supp. 2d 134, 138 (D.D.C. 2013) and *Z.B. v. District of Columbia*, 382 F. Supp. 3d 32, 47 (D.D.C. 2019)). Despite the Davises' disagreement with the IEP team on whether Eagleton was an appropriate placement, DCPS did not deny B.D. a FAPE by recommending he be placed there. *Id.* at *10. The 2012 IEP, which recommended a residential placement and services almost identical to those in the July 2013 IEP, complied with the IDEA. *B.D.*, 548 F. Supp.

3d at 234; *compare* AR1 at 108–161 (October 2013 IEP), *with* AR2 at 293–317 (July 2013 IEP).

It was the Davises who rejected Eagleton as a placement and invoked the IDEA's stay-put provision to keep B.D. in one-on-one home tutoring. *See B.D.*, 2023 WL 6037202, at *1–2. They raised, in particular, concerns about B.D.'s "ability to learn and progress in a residential treatment center given his[] auditory triggers and [his] experiences with recent inpatient hospitalizations." AR2 at 666; *B.D.*, 2021 WL 6049879, at *4. These concerns were not unfounded; B.D.'s temporary stint at the Katherine Thomas School was unsuccessful, due in part to his "disruptive and unsafe behavior" and an increase in compulsive behavior. *B.D.*, 817 F.3d at 795. And in the time in between the July 16, 2013 IEP meeting and the October 1, 2013, IEP meeting, B.D. was hospitalized at two different hospitals, largely "due to his almost non-existent ability to process normal sensory experiences, coping skills, self-regulation skills and social skills." AR2 at 205; *B.D.*, 2021 WL 6049879, at *3. That said, it was the Davises who insisted that B.D. would not have been able to benefit from residential placement at that time, *not* DCPS. AR2 at 666; *B.D.*, 2021 WL 6049879, at *4. DCPS cannot be blamed for B.D.'s lack of a residential placement during this time, and the failure to put B.D. in a residential placement cannot be traced back to the Davises' absence at the July 16, 2013 meeting.

Plaintiffs argue that it is irrelevant that the 2013 IEP called for a residential placement and various other services because those services were not in fact provided. *See* Pl. MSJ at 22–28. But, as detailed above, the failure to provide B.D. these services did not stem from the Davises' absence at the July 2013 IEP meeting. And, as defendant points

11

out, plaintiffs never brought a claim challenging the failure to secure a residential placement for B.D. during the 2013–14 school year. *See* Def. MSJ at 18. To the contrary, plaintiffs sought to avoid a residential placement and keep B.D. in one-on-one tutoring. *See* AR2 at 666; *B.D.*, 548 F. Supp. 3d at 229; *B.D.*, 2021 WL 6049879, at *4. Plaintiffs argue that because it was determined that the 2013 IEP denied B.D. a FAPE, no matter in what capacity, they are entitled to a windfall of the monetary value of a year's worth of services. *See* Pl. MSJ at 25–26. They cite no authority, however, to support this proposition.[6]

*Second*, Hearing Officer Vaden correctly quantified the harm that resulted from DCPS's exclusion of the Davises from the July 16, 2013 IEP meeting. He first noted that B.D.'s 2012, July 2013, October 2013, and July 2014 IEPs were all quite similar. AR2 at 667–69. He then noted that the Court held that the July 2014 IEP complied with the IDEA. *Id.* at 670–71; *see B.D.*, 2021 WL 6049879, at *10. Next, he compared the July 2013 IEP to the July 2014 IEP, concluding that "we can deduce how the 2013 IEP would likely have been different if the Parents had been at the meeting." AR2 at 671. After comparing the two IEPs, he noted that there were only two significant differences; *first*, B.D.'s annual goals and present levels of performance had been updated, and *second*, the 2014 IEP included Assistive Technology for Learning and Studying. *Id.*; *compare id.* at 293–317

---

[6] Plaintiffs' reliance on *District of Columbia v. Oliver*, 991 F. Supp. 2d 209 (D.D.C. 2013) is misplaced. In *Oliver*, my colleague held that a child may have a "current educational placement" absent an IEP and a school district may be required to reimburse parents for out-of-pocket costs incurred in maintaining a "current educational placement" when the district has both denied the child a FAPE and that placement is appropriate. *See* 991 F. Supp. 2d at 214–17. Here, however, plaintiffs do not seek costs paid out-of-pocket to maintain B.D.'s current educational placement in the 2013–14 school year, but instead seek the monetary value of all services included in the 2013 IEP. There is no precedent for such an award!

(July 2013 IEP), *with id.* at 346–73 (July 2014 IEP). Thus, he concluded that had the Davises been present at the July 2013 IEP meeting, these updates would have been included. AR2 at 671.

Plaintiffs' arguments to the contrary are unconvincing. They claim that "[i]f a proper IEP had been developed for B.D., he would then have been able to receive all of the services he needed (specialized instruction removed from typical peers throughout the day, occupational therapy, speech/language therapy, behavioral support, parent counseling and training, and dedicated aides) in an appropriate environment—a therapeutic residential facility." Pl. MSJ at 9. But that statement is contradicted by other facts in the record, not least the fact that the Davises insisted in October 2013 that B.D. would not be able to benefit from a residential treatment center at that time because of his various behavior problems. AR2 at 666; *B.D.*, 2021 WL 6049879, at *4. Furthermore, during that year, the Lindamood-Bell Center declined to provide further tutoring services to B.D. unless he was accompanied by a professional behavior specialist because of his behavior, which included "leaving the room, screaming profanities, destroying instructional materials, vandalism to the walls using pens and markers, leaving the center punching and hitting himself, hitting and punching his mother, slamming his head on the wall and desk, throwing materials at his mother, and destroying property by kicking and shattering wall hangings." Pl. MSJ at 8–9; AR1 at 898. The record suggests that it was not a lack of updated goals and levels of performance that prevented B.D. from securing an appropriate residential placement, but

13

his "disruptive and unsafe behavior." *See B.D.*, 817 F.3d at 795.[7]

Thus, plaintiffs have failed to show that the hearing officer erred or that they are entitled to the compensatory education plan they propose. What they seek is a windfall for years of alleged harms far beyond the narrow issue here. My task is limited to determining what amount of compensatory education will remedy the Davises' absence from the 2013 IEP meeting. Plaintiffs are asking for nearly half a million dollars to try to make up for a child whose education, for various reasons, has not panned out as hoped. While deserving of sympathy for what is undoubtedly an extremely difficult situation, they are simply not entitled to the compensation they seek. Thus, I will GRANT DCPS's motion for summary judgment on this issue.[8]

## II.   Count Seven

Regarding Count 7 of the Amended Supplemental Complaint, the Davises seek $124,091.04 in legal fees and costs as prevailing parties under the IDEA. Pl. MSJ at 33–42. DCPS does not oppose this request. Def. MSJ at 1. I will award plaintiffs $124,090.24.

The IDEA allows a court, in its discretion, to award attorneys' fees and costs "to a prevailing party who is the parent of a child with a disability," subject to certain exceptions not applicable here. 20 U.S.C. § 1415(i)(3)(B)(I), (D)–(E). The Davises prevailed here by

---

[7] Plaintiffs also claim that the lack of residential placement in the 2013–14 school year caused B.D. to regress so much that he was unable to benefit from the limited services he was provided. *See* Pl. Opp. at 3–4. But the record shows that B.D. started to regress, and his disruptive behaviors started to increase, far before July 2013. *See B.D.*, 817 F.3d at 795; *B.D.*, 2021 WL 6049879, at *4. Thus, the record does not support the assertion that the lack of residential placement in 2013–14 caused B.D.'s regression.

[8] Plaintiffs also request that any funds awarded for future services be placed in a trust fund managed by a neutral party. Pl. MSJ at 33; Pl. Opp. at 27–30. I rejected this request in another related case, and I will do so here as well. *See B.D.*, 2023 WL 6037202, at *5.

obtaining "some form of judicial relief" that their exclusion from the July 16, 2013 IEP meeting denied B.D. a FAPE. *Douglas v. District of Columbia*, 67 F. Supp. 3d 36, 41–42 (D.D.C. 2014).

The fees awarded "shall be based on rates prevailing in the community . . . for the kind and quality of services furnished," and "[n]o bonus or multiplier may be used in calculating the fees." 20 U.S.C. § 1415(i)(3)(C). The "basic formula" is to multiply the number of hours reasonably expended by a reasonable hourly rate. *DL v. District of Columbia*, 924 F.3d 585, 588 (D.C. Cir. 2019). The Davises claim the following hours and rates: Diana M. Savit at $505 per hour for 201.35 hours worked ($101,681.75); Diana M. Savit at 50 percent of rate[9] ($252.50) for 77.4 hours worked ($19,543.50); Diana M. Savit at paralegal rate ($140) for 9 hours worked ($1,260); Mathieu Antezana at $75 per hour for 6 hours worked ($450); and Dari Pogach at $110 per hour for 8 hours worked ($880). Pl. MSJ at 33–42; Savit Decl. [Dkt. #71-9] ¶ 29. The Davises calculate the total as $123,816.05. *Id.*

Everyone agrees that the hours expended here are reasonable. *See Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015) (moving directly to analysis of hourly rates when "the District no longer challenges the hours Eley's lawyer spent litigating her IDEA case"). Similarly, everyone agrees that the hourly rates were reasonable. However, the provided hours worked and hourly rates add up to slightly less (by $0.80) than the

---

9 Ms. Savit billed some work at reduced rates to account for only partial success or to avoid double-counting with another case. Pl. MSJ at 36.

$123,816.05 in legal fees that the Davises claim. The subtotals above calculate to $123,815.25 in total fees based on the line items.

Plaintiffs also claim $274.99 in costs, including a filing fee, printing/copying, postage, and travel. Pl. MSJ at 33; Savit Decl. ¶ 30. As the District agrees, those costs are reasonable. *Coates v. District of Columbia*, 79 F. Supp. 3d 42, 51 (D.D.C. 2015).

Thus, I will GRANT plaintiffs' motion for summary judgment on this count and will award $124,090.24 in attorneys' fees and costs.

## CONCLUSION

For the foregoing reasons, the Court will GRANT IN PART and DENY IN PART each parties' motion for summary judgment [Dkt #71, #73]. An order consistent with this decision accompanies this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge